Beaulieu of America, Inc. (Beaulieu) appeals from a ruling by the circuit court's denial of its motion for a judgment notwithstanding the verdict (JNOV) following the entry of a judgment based on a jury verdict in favor of Bobby Joe Dunn, a former employee. Dunn alleged that Beaulieu violated Ala. Code 1975, § 25-5-11.1, by terminating his employment in retaliation for his making a workmen's compensation claim. Dunn contends that in March 1991, he sustained an on-the-job injury as a result of exposure to chemicals that irritated his lungs and skin. After taking medical leave, Dunn returned to his job in May 1991.
Dunn sued for workmen's compensation benefits, but he ultimately settled his claim against Beaulieu and dismissed his complaint for benefits on July 3, 1991. On July 21, 1991, Dunn's employment was terminated by his supervisor, who contended that Dunn had left his job position three times, without permission, in violation of the company's policy, causing a hardship on Dunn's immediate co-workers and a loss of production in the department. Thereafter, on July 31, 1991, Dunn sued Beaulieu, alleging retaliatory discharge and seeking damages, both compensatory and punitive.
Ala. Code 1975, § 25-5-11.1, provides:
 "No employee shall be terminated by an employer solely because the employee has instituted or maintained any action against the employer to recover workers' compensation benefits under this chapter or solely because the employee has filed a written notice of violation of a safety rule pursuant to subdivision (c)(4) of Section 25-5-11."
Upon a denial of Beaulieu's motion for summary judgment, the case proceeded to trial. The events which transpired at trial are somewhat unusual. Beaulieu denied Dunn's allegations of retaliatory discharge and presented evidence that Dunn's employment was terminated as a result of his violation of company employment policies. At the close of Dunn's evidence and again at the close of all the evidence, the court denied Beaulieu's motion for a directed verdict. After extensive deliberations, the jury initially reported that it could not reach a verdict. Upon encouragement by the trial court, the jury resumed its deliberations; it returned a verdict for Dunn, but failed to assess damages against Beaulieu other than costs. After further instruction, the jury returned a verdict for Dunn, assessing compensatory damages in the amount of $10,000, and zero *Page 456 
dollars in punitive damages. Dunn filed a post-judgment motion for additur or, in the alternative, for a new trial. Beaulieu filed a motion for a judgment notwithstanding the verdict, or, in the alternative, for a new trial. The trial court denied Dunn's motion for additur, granted Dunn's motion for a new trial, denied Beaulieu's motion for JNOV, and deemed Beaulieu's motion for a new trial to be moot in view of its grant of a new trial to Dunn. It is from the trial court's denial of the motion for directed verdict and its denial of a JNOV that Beaulieu appeals.
On appeal, Beaulieu contends that Dunn failed to present substantial evidence that the termination of his employment was in retaliation for his filing a workmen's compensation claim, and therefore, that the trial court erred in denying its motion for a directed verdict and its motion for a JNOV. Dunn asserts that Beaulieu is not entitled to the relief it requests, because the trial court granted the alternative relief it sought, which was a new trial.
A court's ruling on a motion for JNOV, as in the case sub judice, even though a motion for a new trial has been granted, may be a final, appealable order. See John Crane-Houdaille,Inc. v. Lucas, 534 So.2d 1070 (Ala. 1988); see also Ala. Code 1975, § 12-22-10. A motion for JNOV challenging the sufficiency of the evidence is measured by the substantial evidence rule. Ala. Code 1975, § 12-21-12(d); John R. Cowley Bros., Inc. v.Brown, 569 So.2d 375 (Ala. 1990). The standard applicable to a motion for JNOV is identical to the standard used by the trial court in granting or denying a directed verdict motion. John R.Cowley, supra. Like a directed verdict, a JNOV is proper when the party with the burden of presenting evidence has failed to present "substantial evidence" in support of its position. Ala. Code 1975, § 12-21-12(a), -12(c); John R. Cowley,supra. Substantial evidence is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida,547 So.2d 870, 871 (Ala. 1989).
It is well settled in Alabama that an employment contract is generally terminable at will by either party, with or without cause or justification — for a good reason, a bad reason, or no reason at all. Hoffman-La Roche, Inc. v. Campbell,512 So.2d 725 (Ala. 1987). Ala. Code 1975, § 25-5-11.1, however, provides one exception to this general rule where the employee is dismissed based solely on the filing of a workmen's compensation claim. Culbreth v. Woodham Plumbing Co.,599 So.2d 1120 (Ala. 1992). In Twilley v. Daubert Coated Products, Inc.,536 So.2d 1364, 1369 (Ala. 1988), our Supreme Court interpreted this statute as follows:
 "We hold that an employee may establish a prima facie case of retaliatory discharge by proving that he was 'terminated' because he sought to recover worker's compensation benefits, which would be an impermissible reason. The burden would then shift to the defendant employer to come forward with evidence that the employee was terminated for a legitimate reason, whereupon the [employee] must prove that the reason [given by the employer] was not true but a pretext for an otherwise impermissible termination."
Moreover, after the defendant has met his burden of coming forward with evidence of a legitimate reason, " '[t]he plaintiff then has the burden of going forward with rebuttal evidence showing that the defendants' reasons' " for terminating the plaintiff's employment are untrue.Twilley at 1369 (citation omitted).
In viewing the evidence as required, i.e., in the light most favorable to Dunn, the nonmoving party, pertinent facts are disclosed. Dunn testified that in May 1989, he began working for Beaulieu, which manufactures yarn for carpet. Dunn contended that in March 1991, he sustained an on-the-job injury as a result of exposure to chemicals in the Beaulieu plant, and that the injury resulted in his being out of work for approximately two months. Dunn's physician recommended that he be transferred to another job in the plant in an area with better ventilation; however, Dunn contends that his supervisors refused this request. In May 1991, Dunn filed a workmen's compensation complaint against *Page 457 
Beaulieu, which was ultimately settled, and the complaint dismissed on July 8, 1991.
The events which culminated in Dunn's employment termination occurred on July 21, 1991. Dunn testified that on that day, he was instructed, via the plant's public address system, to report to his supervisor's office. He testified that, upon presenting himself to Julie Shiflett, his supervisor, he was informed that he was fired. He testified that when he asked for a reason, Shiflett did not respond, but referred him to the personnel office on Monday. Dunn further testified that on Monday, he reported to the personnel office and initially met with Beth Maury, the personnel manager, who told him to come back the next day. Dunn testified that the next day, he met with Bob Ingram, corporate director of safety and risk management; Shiflett; and Gary Casper, the plant manager. According to Dunn, when he walked into the office, he was asked whether he was the one that recently filed a workers' compensation claim against Beaulieu, to which Dunn said he replied that "this wasn't nothing to do with me being down here now." Dunn further testified that after he told them that the case was dropped, he was told that the reason his employment was being terminated was because he was not doing his job.
On cross-examination, Dunn admitted that on November 28, 1989, he had walked off his job because of a dispute with his supervisors, but later, he had returned to work. He further testified that he received a verbal warning when he failed to come to work at the appointed time on April 30, 1990. In May 1990, he received a verbal warning for "clocking in" late, and in June 1990, he received a written warning regarding his absenteeism. In January 1991, Dunn acknowledged his absenteeism by signing a written warning for excessive absenteeism. By that acknowledgment, Dunn stated that he was aware of his attendance problem, that he would work toward being present for work each day, and that he agreed to be present for all scheduled overtime. In June 1991, he received a three-day suspension as progressive discipline for failure to report for work on June 26, 1991. Written notice of that suspension noted Dunn's "previous attendance problem."
A co-employee, James Adams, who had worked next to Dunn on his line, testified. When asked if Dunn ever left his line on the day in question, Adams initially stated: "Everybody leaves their line to go to the restroom, get a coke, such as that. As far as that goes, I wasn't paying no attention, making it a point to watch for it." When questioned whether he ever remembered seeing Dunn "gone from his line" or if he saw Shiflett discipline Dunn on that occasion, Adams replied that he could not remember. Upon expressing surprise, Dunn's counsel was allowed to further question Adams regarding whether he remembered a phone conversation in which he told counsel that he did not recall Dunn ever leaving his line that day except to go to the bathroom or "get a drink." Adams's response regarding his memory of that conversation was: "As far as my knowledge goes" and "I don't remember."
Over Beaulieu's objection, a former employee, Reba Dotson, was allowed to testify in substance that she had filed a workmen's compensation claim against Beaulieu, and that she was also later dismissed from employment. The court instructed the jury that her testimony could be considered for "the limited purpose of determining whether there may be a practice on the part of Beaulieu of terminating employees filing workmen's compensation claims and whether the termination of the plaintiff in this case, Bobby Joe Dunn, was a part of that practice."
Shiflett testified that she was the person who had interviewed and hired Dunn, and that upon being hired, Dunn signed a statement acknowledging his understanding that his employment was for no definite period of time; that he could be discharged at any time; and that in consideration of his employment, he agreed to conform to the rules and regulations of the company. Shiflett also described the process by which the plant manufactured yarn and how the spin texturizing machines (STM) operated by Dunn and others were involved in that process. Each STM operator operates 6 positions and works with a "fixer," who is responsible for maintaining *Page 458 
the machinery of 18 positions. The fixers regulate the schedule regarding the morning break, the lunch break, and the afternoon break. When a worker takes a break, the fixer or an operator on that line must be aware of the fact that the worker is leaving the line. Shiflett stated that on the day in question, they were experiencing "runability problems" on lines 5 and 6. She made rounds every hour to check the number of positions that were running, and when she made a round at approximately 2:30 p.m., she did not see Dunn in the area. Earlier in the day, she had discovered him talking to an employee on another line and requested that he return to his work area. She further testified that Jeff Furnace worked next to Dunn and was having some problems with his lines. She helped Furnace resolve those problems and then walked around the department attempting to find Dunn, without success. As she was returning from the office area, she saw Dunn. She testified:
 "I walked up to him and I said listen, we've got some problems on the line. I need you to stay up on the line. That's pretty much all I said to him. He walked back up on the line. I walked over to some other lines . . . we were having some problems with. He was working with them on those lines. It wasn't 10 minutes I was right back down there again. He was gone again. This time I walked through the area. I was trying to find him at that time and walked back toward the break room area through the corridor. I didn't see him; come back up near the line 1 area, office area there; started back up through the department again and I ran into him somewhere line 4, line 3 area there. I walked up to him and I explained to him that we were having runability problems on the line, that he had to stay on that line. Jeff Furnace was a new employee. He had been with the company 4 1/2 months and Jeff was an operator but he still needed help on his area — in that area. He could not be left with the runability of 12 positions to maintain that. 10, 15 minutes later, I go right back up on the line; he is gone again. I couldn't find him at this time. I went to the fixer, Keith Shirley. I asked Keith where is Bobby Dunn. He said I have no idea, I haven't been able to keep up with him all day. At that time I walked through the area. I walked back through the corridor and I went to the break room. I did not see Bobby. I come back out and I went to the office. I talked to Doug Miller who was in the office; went back out and clocked Bobby Dunn out and then went back to the office. I also looked through the department again at that time and I could not find him. So I paged him to the S.T.M. office."
Shiflett further testified that she discussed Dunn's past disciplinary record with Doug Miller, a co-supervisor, and recommended that Dunn's employment be terminated. Shiflett admitted that the termination form did not include notations regarding the two prior incidents that day, but she stated:
 "I didn't really feel that it was going on this far when it started. The first time I walked up and asked him to go back to the line I figured that would be it. But then I had to go back and do it again. Then the third time, that was enough between the performance on the job for that day, the previous dates, the attendance record, enough."
Shiflett denied any knowledge of Dunn's workmen's compensation claim. She indicated awareness of a prior injury to his finger, but asserted that the injury was unrelated to her decision to terminate his employment. She also testified extensively regarding Beaulieu's progressive discipline policy, which she said was applied pursuant to its manual. The first offense involves a documented verbal counseling. The second offense within one year of the first results in a written counseling, which is placed in the personnel file. A third offense within one year of the second requires a suspension not exceeding three days and a fourth offense within one year of the third is normally grounds for discharge. If an employee has no violations for a one-year period from the last offense, he starts over with a "clean slate." Pursuant to policy, attendance includes coming to work, reporting absences in advance, staying at work, and not leaving early. Medical absences do not constitute excessive absenteeism. According to Shiflett, *Page 459 
Dunn had progressed to the stage of employment termination at the time of his discharge. Regarding Dunn's failure to report to work or to notify his supervisor that he was not going to work on June 26, Shiflett stated:
 "I was left with a six position line unmanned. We did not have the personnel to place into that position. He didn't show up to work; he didn't call in. 12:00 noon he comes in ready to go to work. I had talked to Gary Casper about it and I explained to him what he had done. I felt that a 3 day suspension was in order. He had already received a written warning concerning his attendance. That's what the reason for the suspension was and the disciplinary action he had already received numerous warnings — verbal and written."
Upon the denial of Beaulieu's motion for a directed verdict, Beaulieu called Miller, who was a co-supervisor with Shiflett on the day Dunn's employment was terminated, to testify. Miller stated that he discussed the situation with Shiflett and agreed that discharge was proper. He testified that Shiflett summoned Dunn to the supervisor's office and, in his presence, explained to Dunn that his employment was being terminated for numerous reasons, including an attendance problem; leaving his line on several occasions during that shift; having to be taken back to the line; and because "we could not count on him to do his job if he was not there." Miller further testified that he had no knowledge of Dunn's workmen's compensation lawsuit.
On cross-examination, Miller denied any knowledge regarding Dunn's trouble with his lungs. He further testified that Beaulieu had changed the oil used in the plant because it had caused some problems, including a rash on some of the employees.
Lyle Peters, a supervisor at Beaulieu, testified that he and Tony Stubblefield, another supervisor, terminated Dunn's employment in November 1989, when Dunn walked off the line. Later, that termination was changed to a two-day suspension and Dunn returned to work. Peters testified that Dunn had informed him of a coughing problem, and that he had referred Dunn to a doctor. Peters additionally testified to other incidents wherein he was involved in Dunn's disciplinary process.
Furnace testified that he was an STM operator, and that he recalled Dunn's last day on the job. He recalled that he worked directly beside Dunn that day, that it was a busy day, and that the machines were running badly. He recalled that Dunn left the line at least twice that day without coordinating with him, and that during Dunn's absence, he had to monitor Dunn's lines as well as his own. He inquired of Keith Shirley, a fixer, as to Dunn's whereabouts on two occasions; however, Shirley did not know Dunn's whereabouts, so Furnace operated both positions. Furnace further testified that on one occasion that day, he saw Shiflett talking to Dunn and pointing back to his line, although he could not hear what was being said.
Shirley testified that he was the fixer, and that he recalled that on the day Dunn was fired, Furnace had come to him on two occasions inquiring of Dunn's whereabouts. He told Furnace that he did not know where Dunn was. He saw Shiflett come back to the line with Dunn once, and he heard Shiflett summon Dunn once. Later, another operator came to finish Dunn's shift.
Maury testified that during the time in question, she was the personnel manager at Beaulieu, and that she had known Dunn as an employee. She said she was aware of Dunn's history of absenteeism and tardiness, and she said that his discharge was for leaving his line several times without a supervisor's permission. She routinely conducted exit interviews with employees, reviewed employee records to confirm vacation time owed, counseled employees regarding insurance, tool return, etc., and received their comments regarding employment termination. She met with Dunn on Monday following his employment termination. She stated that he was upset over his discharge, and that he claimed that he had left his line several times because he was "throwing up" blood. He requested a meeting with the plant manager about his discharge. She testified that the plant manager was unable to meet with Dunn, and a department manager attended the meeting with Dunn. Present at *Page 460 
the meeting were Shiflett, Casper, and Ingram.
Ingram testified that he attended the meeting with Dunn at Maury's request because Maury had informed him of Dunn's contention regarding "coughing up blood." He stated that at the meeting, Dunn indicated that his discharge was unfair, because, he said, other operators also left the line. According to Ingram, Dunn never mentioned any medical problem or his workmen's compensation claim.
On rebuttal, Dunn was recalled and he testified that he had never seen or heard of Furnace before the day of trial. He further testified that Adams was working beside him on the day he was discharged, and that Frank Hill was his fixer, not Shirley. On cross-examination, Dunn was asked whether he had told Maury that he was away from his line because he was spitting up blood. Dunn replied "I can't recall it if I did." He later testified that he was not coughing up blood, and that he did not leave his line that day. He later testified that Furnace may have worked there, but that he did not know him.
From our thorough review of the record, we find little or no evidence from which to infer that Dunn was the victim of any retaliatory treatment. There is no evidence that Shiflett knew of Dunn's workmen's compensation claim, and there is no evidence that her decision to discharge Dunn was influenced by anything beyond Dunn's work performance. In fact, Beaulieu presented substantial evidence that Dunn's discharge was the result of his poor work performance and poor attendance, and was the final stage of a long-term progressive disciplinary proceeding with Dunn. Dunn failed to rebut Beaulieu's evidence regarding the reasons for his employment termination.
To paraphrase our Supreme Court in Hayden v. Bruno's, Inc.,588 So.2d 874 (Ala. 1991), Dunn presented no evidence showing that Beaulieu terminated Dunn's employment because he had filed a workmen's compensation claim, unless we simply assume that, because Dunn's employment was terminated after he had filed that claim, the termination was retaliatory. We refuse to so assume. Even if he proved a prima facie case, there is no evidence that the reasons Beaulieu gave for his employment termination were a pretext for an otherwise impermissible termination. Hayden, supra. Therefore, the trial court's denial of the motion for JNOV is due to be, and it is hereby, reversed, and a judgment is rendered for Beaulieu.
REVERSED AND JUDGMENT RENDERED.
YATES, J., concurs.
ROBERTSON, P.J., dissents.